[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
These five matters were consolidated and tried to the Court sitting without a jury. All of these matters relate to a construction project known as the "Middletown Tradesmen's Center" in Middletown, Rhode Island. ATR Construction Company, Inc. ("ATR") and Richard Gudoian ("Gudoian") entered into a contract in October of 1987 to construct two buildings and to perform related site work.[1] ATR in turn entered into an oral subcontract with Hugo Key Son, Inc. ("Key") with respect to certain site work. Key made its quote for the site work based upon a review of the site plans and drawings prepared by Gudoian's architect, Pond Associates ("PA").
Key's contract with ATR consisted of excavation, grading, installation of utilities, paving, landscaping, and related work. PA's site plans provided for a 45 foot wide paved roadway/parking area around the buildings, and called for a one foot drop in height of the paved area over the 45 feet from the edge of the buildings to the edge of the pavement (a "pitch" of approximately 2%). After Key began the excavation work, ATR's project manager/superintendent, James Sabetti ("Sabetti"), learned that the Federal Aviation Administration ("FAA") was mandating that the proposed height of the buildings, which are adjacent to an airport, be reduced by one foot below that which was originally planned. Sabetti decided that both entire buildings would be lowered by one foot, and therefore instructed Key to perform additional excavation and grading work to lower by one foot the entire site where the buildings were to be located. Gudoian and Pond concurred with Sabetti's decision.
Key was further instructed by Sabetti that the height of the asphalt at the edge of the pavement was to be six inches lower than the height at the edge of the buildings, rather than one foot lower as had previously been planned. The result was that the paved areas would now have a 1% pitch (one-half of what was originally called for in PA's site plans).
The Court will first determine the amount owed by ATR and/or Gudoian with respect to work performed under the contract. The Court will undertake that determination by ascertaining the original contract price and agreed upon adjustments thereto. The Court will next consider the cost of correcting any defective and/or incomplete work.
The original contract price was $1,175,000. One issue arising with respect thereto is whether ATR agreed to a $35,000 credit with respect to said price. Although ATR's president, Jack Roach ("Roach"), was vague as to whether he agreed to any such credit, it is noteworthy that the document reflecting such credit was prepared on ATR's stationery (Defendant's Exhibit E). Moreover, Gudoian was clear in his testimony that he only agreed to the contract with the $35,000 credit. ATR's agreement to the price change is also indicated by a bill to Gudoian following completion of the contract (Defendant's Exhibit J).
Therefore, the Court finds that the contract was modified by $35,000. The contract price at the outset thus was $1,140,000. The Court will now turn its attention to certain alleged adjustments to the contract:
Charge for Lowering Site:
Gudoian contends that the $16,000. charge by ATR on its final bill of August 15, 1988 to lower the site as required by the FAA was included in the scope of the original contract. The Court agrees with Gudoian's contention. No change order was ever prepared or signed for this work. Article Seven of the contract provides that change orders are written instruments which are signed by the owner and contractor, and which specify the amount of the adjustment in the contract sum, if any. Furthermore, Gudoian's unrebutted testimony was that the necessity for this work was known to ATR before the contract was signed.
In addition to not adhering to the change order provisions of the contract in regard to the FAA required work, ATR failed to notify Gudoian of an increase in the contract price as requested by Key in a letter dated December 2, 1987. ATR also never billed Gudoian for any of the FAA required work in its monthly applications for payments from November, 1987 through June, 1988. That fact raises an inference that ATR felt that Gudoian was not responsible for paying this bill. It was only when the final bill was submitted that this charge was first made known to Gudoian. This was after the time when the dispute between the parties had started.
Accordingly, the Court finds that ATR is not entitled to be compensated for additional charges with respect to the lowering of the site.
Charge to Omit Overhead Doors:
Gudoian proposes further adjustments to the contract price with respect to overhead doors. No change order was ever executed for this change in the contract. Gudoian testified that this change was made known to Roach well before the time when the contract was executed. Gudoian stated that the idea for this change in the specifications was his. Although it was not shown in the contract plans dated April, 1987, no change order was requested by ATR for this work. Furthermore as in the case of the FAA required work, no bill was ever submitted for this change during any of the monthly applications for payments submitted by ATR to Gudoian. It was first billed on August 15, 1988 after the dispute between the parties had begun. Furthermore, ATR and Gudoian used written change orders after this period which would indicate that they had not abandoned their contract requirement for written change orders. In contrast to the lack of a change order for the overhead doors, two change orders for lighting and utilities were agreed to and reduced to writing. This suggests that ATR added the $8,176.00 to the final bill after the dispute between the parties had begun.
ATR should further be denied any recovery for the $8,176.00 because of a lack of proof with respect to the value of the work. There simply was no testimony substantiating the fair and reasonable value of any extras making up the $8,176.00.
The Court thus finds that there was no change order in regard to the overhead door substitution and that this change was known to ATR before the contract was signed. The Court thus finds that ATR is not entitled to the $8,176.00.
Defective and Incomplete Work:
The Court will now focus on certain work alleged by Gudoian to be defective and incomplete and for which monetary damages are sought.
1. Grade of Site: Gudoian proposes that the Court make a factual finding that the lowering of the grade on the site resulted from the FAA's concerns about interference with its runways. This lowering resulted in change in grade from the buildings on the site to the detention swales of six (6") inches. None of the parties controverted this fact.
Gudoian contends that all parties agreed and understood that it was necessary that the grade or cross slope from the edge of the buildings to the detention swales be uniform. This fact is best illustrated by Sabetti's testimony on cross examination that it was understood that a uniform cross slope was supposed to be maintained.
Furthermore, all parties have acknowledged that the grading was not uniform and that as a result puddling occurs on the pavement areas at the Middletown Tradesmen's Center Condominium. The nature and extent of the improper grading and the manner in which it should be corrected is in great dispute. Sabetti testified that approximately 800 square yards of pavement had to be cut and replaced. Hugo Key II, the principal of Key ("Key II") testified that 700 to 900 square yards should be cut and replaced. Both Sabetti and Key II limited their patching to small areas where large puddling was obvious. Neither performed the extensive study of the need for repaving performed by PA for Gudoian.
PA, who designed the site plan for this project, first looked at the site in July, 1988 when Gudoian asked him to look at the possibility of a problem with runoff. After examining the site, PA had the area surveyed and the elevations of the asphalt area were established using a grid analysis conducted by Bibeault and Florentz, surveyors. See Defendant's Exhibits O and P. PA testified that in order to achieve adequate drainage on the pavement it had to be paved to a uniform cross slope of one (1%) percent.
PA also delineated the areas where the pavement had to be replaced. See Defendant's Exhibit S. PA concluded that a minimum of 3,843 square yards of pavement had to be replaced.
James Carson ("Carson") of Narragansett Improvement Co., Inc. testified for Gudoian. He stated that when a minimum cross slope of one percent (1%) is not met, drainage on the pavement is inadequate. It causes pooling, puddling and ice to form in the winter. Carson testified that asphalt disintegrates more quickly because of the water and the useful life of the pavement where puddling occurs is decreased by fifty percent. He found all of these conditions present at the Middletown Tradesmen's Center. He further testified that 4367 square yards of pavement had to be replaced in order to provide adequate drainage at the site. He testified that a repair of the entire pavement was necessary in order to give the site adequate grading and drainage. In his opinion this work could not be accomplished by cutting and patching.
The grade problem was directly attributable to ATR's performance on the job. Key provided testimony that the 1% pitch called for on this particular project was very difficult to achieve because it was "so flat". Moreover, there were no contractual specifications which stated the acceptable amount of deviation of the pitch from mathematical precision and absolute perfection (even though PA conceded that a 1% slope is the absolute minimum required for proper drainage). As Sabetti and Key acknowledged, absolute perfection is never achieved in paving projects of this nature and scope. Areas of bird baths or puddling are not at all unusual and are, in fact, inevitable (especially in this case, where the 1% pitch, according to Gudoian's own experts, left no room for error). Moreover, Gudoian's expert, Steven Clarke ("Clarke"), had core samples taken over the entire area of the pavement. The core samples showed variations in the thickness of the asphalt from 2 — 3 1/2 inches. Clarke testified that the variations in asphalt thickness were "acceptable", and he conceded that these variations alone could explain the deviations from "constant pitch" shown on PA's computer generated diagram (Def. Exh. R).
Even if the pitch or cross slope of the pavement were somehow deficient, the evidence demonstrates that such a deficiency is not Key's responsibility. Gudoian's experts — Franklin Pond ("Pond"), Carson, and Clarke — all testified that in their opinion the "pitch" problem was the result of the subgrade being "off" or contoured improperly. Key, Roach and Sabetti, however, all agree that it was the responsibility of ATR, through its project manager/superintendent Sabetti, to set the grades and to achieve the proper subgrade. Key performed the grading work at all times under Sabetti's direction, supervision, and control. Sabetti testified that he was solely responsible for setting the grades and for ensuring that the work was completed pursuant to his grades. Key simply followed Sabetti's grades and Sabetti's instructions. There is no credible evidence as to any deficiencies or errors with respect to Key's installation of the asphalt. Indeed, as Gudoian's "asphalt expert" Carson testified, it was a "good paving job, just not enough pitch."
2. Drainage Swale: The Court finds that the drainage swale on the east side of the site is not wide enough or deep enough to accomplish its intended purpose. This is outlined in Defendant's Exhibit K, third page, number five, and the photographs, Defendant's Exhibit B and the testimony offered by which PA contended that the detention swale did not drain properly and needs to be corrected. Although Key and ATR disagreed with PA's conclusions, they offered no proof to show that this detention swale worked and was accomplishing its intended drainage purposes.
3. Detention Basin Two: The Court finds as a fact that detention basin number two does not conform in shape to the design plans and its outlet structure has not been constructed. The volume of water which it holds is inadequate. There was general agreement by the parties that PA's conclusions about this item are correct. The detention pond is appreciably smaller than it was intended to be. This change was made, according to the testimony of Sabetti, without consulting PA. Allegedly the smaller detention basin was constructed at the request of Plumber's Supply Co., Inc., whose condominium unit abuts this site. Nevertheless, detention basin number two was an integral part of the detention system for the entire site: Its lack of capacity makes the site vulnerable to erosion and flooding. Furthermore, Gudoian has been billed for the completion of the entire detention pond, even though there is no outlet structure in the pond.
4. Guard Rail and Curbing: It is uncontroverted that this work was not provided.
5. Rip Rap Pads: It is uncontraverted that rip rap pads were not installed. Rip rap pads are necessary to prevent erosion within detention basins and outside them where the water discharges. They are essentially blocks of stone which disburse the water flow and prevent it from scowering or eroding the soil. The lack of rip rap pads is shown in the photographs and was outlined by the testimony offered by PA.
6. Outlet Structure: The Court finds that the outlet structure at detention basin number one has severe sedimentation and a cracked structure. Furthermore, it has been constructed in the incorrect location with an incorrect size for the low flow outlet. The cracked detention pond outlet structure is shown in the photographs. Although ATR's review disputes that the location is improper, there is no real dispute as to the fact that the detention pond outlet structure must be reconstructed. The pictures clearly show the cracked structure and the sedimentation.
7. Emergency Spillways: The Court finds that the emergency spillways for both detention basins have not been constructed. Both Key and Roach acknowledge that the emergency spillways have not been constructed.
8. Haybale Erosion Checks: The Court finds that haybale erosion checks were not installed on the site as shown on the design plans. PA offered testimony to that effect. Furthermore, it is described in a letter from PA dated September 9, 1988. Neither Key nor ATR dispute the lack of the haybale erosion checks.
9. Final Loaming and Seeding: The Court finds as a fact that final loaming and seeding of the site was not completed by ATR or Key. Both ATR and Key agreed that final loaming and seeding had not been completed. The nature and extent, however, are in dispute. The lack of loaming and seeding is demonstrated in the photographs and through the testimony offered by PA. It is also indicated in PA's report that heavy erosion exists on east bank of one of the detention basins. It is also apparent that sedimentation is present within the detention basin structures, further showing that loaming and seeding were not done properly.
Having made the above findings with respect to defective and/or incomplete work, the Court will now make the necessary determinations with respect to damages. It is well settled that an award of damage should be designed to put the injured party in as good a position as he would have realized it the contract had not been breached. ATR, as previously found, failed to perform its obligations under the contract.
Carson testified that the fair and reasonable cost to perform such work is $84,239.00. Surabian testified that such work would cost $96,118.00. Both testified that the respective prices were fair and reasonable in the industry and supported their estimates with testimony about their experience in the field, their visits to the site, review of the PA materials and general knowledge of the industry.
Key estimated that the cost of repairing and completing the work was $11,500.00. Sabetti estimated, on behalf of ATR, that the cost of doing the work would be $21,000.00. The discrepancy between their figures and those of Carson and Surabian arose primarily from the amount of the area to be repaved. Both eliminated the alternative of repaving entire sections of the asphalt. But as previously determined by the Court, extensive repaving (not the limited repaving as contended by ATR), is required. The Court, however, does not agree that the 575 square yard area at the southeast corner of "building two" needs to be repaved. The Court adopts Carson's estimate and adjusts it by $4,900.00, the amount he stated would not be incurred as a result of eliminating the 575 square yard area from the work. The Court finds Carson's testimony based on the detail presented therein to be more reliable than Surabian's testimony. Accordingly, the Court finds that the fair and reasonable cost to repair defective and/or incomplete work is $79,339.00.
The Court will now address remaining issues of damages and/or credits that exist.
Gudoian proposes that the Court make a factual finding that he incurred a cost of $3,144.00 from Dig Construction Co., Inc. to install a temporary French drain alongside the west side of building number two into the detention swale servicing this building. This temporary drainage facility was testified to by Gudoian and other witnesses. This is a temporary measure which was done to alleviate the backflowing of water into the condominium units on the west side of the building since backflowing was particularly severe during the winter. There is no dispute that this work was done. It was clearly evident during a view of the site and is shown in the photographs. The fair and reasonable value of the work was testified to by Surabian. It was proximately caused by ATR's breach of the contract as above found and was a reasonably foreseeable result arising from ATR's breach of the contract as previously found by the Court.
The necessity for this work was further outlined by Greg Weatherbee who testified about the difficulty of using his condominium unit with the three or four foot wide french drain in front of it, and the fact that water still drains back into his condominium. Frank Toner, an electrician, also testified about the back draining of water at the Middletown Tradesmen's Center Condominium into his condominium unit. He also described the icy road conditions present at the site because of the poor drainage and told of his experience in sliding off the pavement because of the effect of freezing puddles. Sidney Gorham, a real estate broker, also testified that there is a need for corrective work on this property and that presently the poor drainage causes travel and access problems for unit owners, in addition to water draining into the units. He also testified to an adverse effect on rentals.
ATR had sued Gudoian for $109,301. based on his August 15, 1988 bill as amended at trial. Based on that bill, the following credits should be made with respect thereto in view of the Court's findings of fact as previously set forth:
(1) $35,000. reduction at time of contract
(2) $16,000. for lowering site
(3) $ 8,176. with respect to the overhead doors
(4) $ 1,500. payment to Sabetti[2]
After accounting for these credits, a balance of $48,625. is owed on the contract. However, in light of the Court's finding that certain work performed by ATR under the contract was defective and/or incomplete and that the cost necessary to cease or complete said work is $79,339., and that temporary repairs in the amount of $3,144. were required, Gudoian is entitled to recover damages against ATR in the amount of $82,483. Reducing the amount of damages Gudoian is entitled to recover from ATR by the amount Gudoian owes ATR under the contract, Gudoian is entitled to judgment against ATR in the amount of $33,858.
Key is entitled to recover against ATR the judgment in the amount of $48,520., said sum being the amount owed to it under its oral contract with ATR less the value of "punch list" items so-called that Key did not perform. The reduction for punch list items was established by using the cost of performing the same as testified to by Carson which cost would be $14,195. It would not include any reduction for the cost associated with repaving which the Court has previously found are the responsibility of ATR rather than Key.
Certain remaining issues need to be addressed with respect to various causes of action asserted in these consolidated matters. Gudoian has alleged that ATR slandered title, maliciously prosecuted, and abused process in filing its' mechanic's lien, subsequent petition to enforce the lien, and lis pendens. Each such assertion would require proof of malicious intention by ATR to damage Gudoian. There is no evidence from which the Court could conclude that ATR acted with such malice. Moreover, as it pertains to malicious prosecution, such assertion is premature in any event since any such action would be predicated on Gudoian prevailing in the action now before the Court. Although Gudoian does prevail with the issuance of this decision and the entry of judgment thereupon, malicious intent has not been proven. The finding of the Court in that regard in the matters now before it would have preclusive effect with respect to such issue under the doctrine of collateral estoppel.
CONCLUSION
Based on the foregoing findings of fact and conclusions of law, the various actions tried in this consolidated hearing should be and are disposed as follows:
1.) Gudoian v. ATR Construction Co., C.A. No. 89-0171
(a) Count I of the Complaint alleging slander of title is denied.
(b) Count II of the Complaint alleging abuse of process is denied.
(c) Count III of the Complaint alleging malicious use of process is dismissed.
(d) Count IV of the Complaint seeking punitive damages is denied.
2.) ATR Construction Co., Inc. v. Gudoian, C.A. No. 89-0293
(a) Count I of the Complaint alleging breach of contract is denied.
(b) Count II of the Complaint seeking recovery in quantum meruit is denied.
(c) Count III of the Complaint seeking recovery in quantum meruit and quantum valebant is denied.
(d) Gudoian prevails on the counterclaim and is awarded damages in the amount of $33,858.
3.) ATR Construction Co., Inc. v. Gudoian, M.P. No. 88-0601.
ATR's petition to enforce a mechanic's lien is denied.
4.) Hugo Key Son, Inc. v. ATR Construction Co., Inc., C.A. No. 90-0311.
(a) Plaintiff prevails on Count I and Count II of its complaint and is awarded damages in the amount of $48,520.
(b) Defendant's counterclaim seeking indemnification and contribution is denied.
5.) Hugo Key Son, Inc. v. Richard Gudoian, N.M. No. 88-0498
The Court reserves decision on this action to enforce a mechanic's lien. In the event that execution is realized on the judgment to be entered with respect to C.A. No. 90-0311, the mechanic's lien petition would become moot.
Counsel shall prepare forms of judgment in each of the respective actions excepting NM No. 88-0495 reflecting the Court's findings and decision and including therein as it relates to C.A. No. 89-0293 and C.A. No. 90-0311 an award of prejudgment interest. Said judgments shall reflect the substitution of John Roach for ATR as agreed at trial.
[1] ATR is now defunct. John Roach, ATR's President, agreed at trial to be substituted for ATR in each of the above actions in which ATR is a party.
[2] The evidence at trial was uncontroverted that this minor adjustment is required. The $1,500 represents a payment to Sabetti for plans as evidenced by check #1139.